**Certiorari Granted, October 18, 2010, No. 32,534**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2010-NMCA-090**

**Filing Date:  June 17, 2010**

**Docket No.  28,240**

**ART BUSTOS, as Personal Representative of
the Estate of MARCOS LEANDRO BACA,
deceased, and MARCOS BACA, TERRI
BACA, and ABEL BACA, individually,**

**Plaintiffs-Appellees,**

**v.**

**HYUNDAI MOTOR COMPANY, HYUNDAI
MOTOR AMERICA, and BORMAN MOTOR
COMPANY,**

**Defendants-Appellants**.

**APPEAL FROM THE DISTRICT COURT OF SAN MIGUEL COUNTY
James A. Hall, District Judge**

Gaddy Jaramillo
David J. Jaramillo
Maria E. Touchet
Albuquerque, NM

Watts Law Firm, L.L.P.
James H. Hada
Robert J. Patterson
Corpus Christi, TX

for Appellees

Prichard, Hawkins, McFarland & Young LLP
David M. Prichard
San Antonio, TX

1

Montgomery & Andrews, PA
Walter J. Melendres
Santa Fe, NM

Winston & Strawn LLP
Gene C. Schaerr
Geoffrey P. Eaton
Washington, DC

for Appellants

Keleher & McLeod, PA
Thomas C. Bird
Albuquerque, NM

for Amicus Curiae The Product Liability Advisory Council, Inc.

Lewis and Roca LLP
Thomas P. Gulley
Albuquerque, NM

for Amicus Curiae Association of Commerce and Industry

## OPINION

**BUSTAMANTE, Judge.**

**{1}**      Marcos Leandro Baca was killed in a rollover accident involving a Hyundai automobile.  Mr. Baca's estate, parents, and brother (Plaintiffs) brought suit against Hyundai Motor Company, Hyundai Motor America, and Borman Motor Company (Defendants) in negligence, implied warranty, and strict products liability asserting that the roof structure of the car was defectively designed.  The jury found in favor of Plaintiffs on all claims and awarded $4.2 million.

**{2}**      Defendants appeal arguing that (1) the district court abused its discretion in admitting expert testimony as to the design defect and enhanced injury, (2) Plaintiffs failed to prove that a design defect existed, (3) Plaintiffs failed to prove the degree of injury enhancement resulting from the alleged design defect, and (4) the district court erred as a matter of law by failing to specifically instruct the jury that Plaintiffs were required to prove the feasibility of a reasonable alternative design which could have eliminated the alleged defect.  We affirm the district court's entry of judgment on the jury verdict.

## BACKGROUND

2

**{3}** The twenty-one-year-old Mr. Baca was riding in the right front passenger seat of a 2002 Hyundai Accent when its driver lost control, causing the vehicle to leave the roadway and roll over three and one-half times before coming to rest on its roof. When the driver lost control, the Accent was traveling at a speed of approximately sixty-four miles per hour, but the car had slowed down to between thirty-two and thirty-four miles per hour by the time it began to roll over.

**{4}** During the rollover, the roof over the passenger seat crushed downward and inward. The roof rail dropped down vertically to the top of the passenger seat headrest and horizontally such that approximately half of the headrest extended outside the plane of the side window. By the time the Accent came to rest, the A-pillar, which connects the front of the door frame along the windshield to the roof rail, had crushed 10.9 inches and the B-pillar, which connects the back of the door frame to the roof rail, had crushed 10.8 inches. The passenger door had also come open.

**{5}** With the vehicle upside down, Mr. Baca remained buckled into his safety belt in the passenger seat. Mr. Baca's head was outside the plane of the passenger side window and atop a CD changer, which had become dislodged from the vehicle during the rollover and was now lying on the ground immediately outside the passenger side window. The roof above the driver's side of the Accent was not as severely deformed, and the driver was able to walk away from the accident.

**{6}** The Office of the New Mexico Medical Examiner found that Mr. Baca's death was caused by positional asphyxia. He was inverted with his body located in such a way that the vehicle weighed down against his head and neck, and flexed his chin into his chest. According to witnesses, Mr. Baca was stuck in this position.

**{7}** Plaintiffs relied on the testimony of two expert witnesses to establish first, the existence of a design defect in the 2002 Hyundai Accent, and second, that the design defect caused the injury enhancement of death. At trial, John Stilson, an automotive and safety consultant, testified on behalf of Plaintiffs. Mr. Stilson examined the subject vehicle and testified that, as a result of the roof crush in this accident, the survival space within the Accent was reduced to below what would be necessary for rollover protection.

**{8}** Joseph Burton, M.D., a forensic pathology and forensic medicine consultant, also testified on behalf of Plaintiffs. Like Mr. Stilson, Dr. Burton examined the subject vehicle. Dr. Burton explained that merely hanging upside down in the vehicle would not have caused Mr. Baca to asphyxiate. However, Mr. Baca's body was forced into compression by the deformation to the Accent's roof resulting in Mr. Baca's head being placed outside of the vehicle and on top of the CD changer. Mr. Baca's regular breathing was also impaired by compression of his rib cage that prevented his diaphragm from functioning properly. Mr. Burton's ultimate opinion was that Mr. Baca died from positional asphyxiation caused by "the condition the vehicle put his body in when it came to rest."

**{9}**   On appeal, Defendants argue (1) that the testimony of Mr. Stilson and Dr. Burton should not have been admitted; (2) that even if it were properly admitted, it failed to carry Plaintiffs' burden of showing a design defect that caused an enhanced injury; and (3) even if it were sufficient to make such a showing, the jury was improperly instructed on what it was required to find.   We address each argument in turn and affirm the judgment of the district court.

**DISCUSSION**

**1.      The District Court Did Not Abuse Its Discretion in Permitting the Expert Testimony of Mr. Stilson and Dr. Burton**

**{10}**   Defendants argue that the testimony of Plaintiffs' expert witnesses, Mr. Stilson and Dr. Burton, should have been excluded based on reliability considerations under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its New Mexico counterpart, *State v. Alberico*, 116 N.M. 156, 861 P.2d 192 (1993).   In *Alberico*, the New Mexico Supreme Court adopted an approach, similar to that established by the United States Supreme Court in *Daubert*, clarifying that Rule 11-702 NMRA requires three prerequisites for admission of expert testimony:   (1) the expert must be qualified; (2) the scientific evidence must assist the trier of fact; and (3) the expert may only testify to "scientific, technical or other specialized knowledge."   *Alberico*, 116 N.M. at 166, 861 P.2d at 202 (internal quotation marks and citation omitted).   In addition, the Court cited favorably to *Daubert* for several non-determinative factors in applying Rule 11-702. *Alberico*, 116 N.M. at 166-67, 861 P.2d at 202.

**{11}**   Here, Defendants do not challenge Mr. Stilson's or Dr. Burton's qualifications. Defendants' argument is that Mr. Stilson's expert testimony was not helpful to the jury and was unreliable because it was too generalized and not based on the specific facts of this case. Defendants' challenge to Dr. Burton relies entirely on the success of their challenge to Mr. Stilson's testimony:   with Mr. Stilson's testimony excluded, they argue there would be no predicate showing of a design defect to support Dr. Burton's opinion as to causation.

**{12}**   Plaintiffs point out that it is unclear whether *Alberico* applies to the testimony of Mr. Stilson and Dr. Burton because New Mexico courts have limited *Alberico* to expert witness testimony based on scientific knowledge.   In the alternative, Plaintiffs argue that, even if *Alberico* does apply, the district court did not abuse its discretion in admitting these two expert witnesses.   In order to fully address the issue, we briefly review New Mexico's law on the application of *Alberico*.

**{13}**   The *Alberico* prerequisites for expert testimony are applied somewhat differently by New Mexico courts than by federal courts applying *Daubert*.   In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the United States Supreme Court clarified that its ruling in *Daubert* applied not only to expert testimony that was scientific in nature, but to all "technical" or "other specialized" matters within the scope of Rule 702.   *Kumho Tire Co.*,

4

526 U.S. at 146-47. New Mexico has not incorporated the holding of *Kumho Tire Co.* into its law.

**{14}** In *State v. Torres*, 1999-NMSC-010, 127 N.M. 20, 976 P.2d 20, the New Mexico Supreme Court limited the requirements of *Daubert/Alberico* to testimony that requires scientific knowledge, stating that "application of the *Daubert* factors is unwarranted in cases where expert testimony is based solely upon experience or training." *Torres*, 1999-NMSC-010, ¶ 43 (internal quotation marks and citation omitted). The language in *Torres* was adopted from *Compton v. Subaru of America, Inc.*, 82 F.3d 1513, 1518 (10th Cir. 1996), which was subsequently overruled by *Kumho Tire Co.* Even though *Compton* has been overruled, New Mexico has continued to recognize *Compton*'s rationale—as adopted in *Torres*—that *Alberico* does not extend to expert testimony based on non-scientific knowledge. *See Banks v. IMC Kalium Carlsbad Potash Co.*, 2003-NMSC-026, ¶ 19, 134 N.M. 421, 77 P.3d 1014 (stating that in *Torres* "we limited the requirements of *Daubert/Alberico* to testimony that requires scientific knowledge"); *State v. Lente*, 2005-NMCA-111, ¶ 4, 138 N.M. 312, 119 P.3d 737 (recognizing that "New Mexico law requires only that the trial court establish the reliability of scientific knowledge, and does not apply the *Daubert-Alberico* standard to all expert testimony").

**{15}** Defendants submitted a pretrial motion and motions at the close of all evidence arguing that Mr. Stilson's and Dr. Burton's testimony should be excluded under the authority of *Daubert/Alberico*. Though it did not detail New Mexico's application of these cases, the district court ruled from the bench that the testimony of both Mr. Stilson and Dr. Burton met the standards of *Daubert/Alberico*. We perceive the district court's remarks as an indication that it was applying a *Kumho* standard. With respect to Defendants' argument that Mr. Stilson's testimony was too general to satisfy *Daubert/Alberico* standards, the district court found it to be "perfectly appropriate for an expert to take generalized princip[les] related to the amount of crush in a vehicle[,] and then apply them to the issues here." The court further stated its finding that Mr. Stilson's opinion could "tie to Dr. Burton's opinion as to the cause of death." The district court ultimately denied Defendants' motion to exclude these witnesses. We conclude that the district court did not abuse its discretion in admitting the testimony of Mr. Stilson and Dr. Burton.

**{16}** We do not address whether the district court was correct in applying *Daubert/Alberico/Kumho* in this context. If it was in error doing so, the error was harmless because the effect was merely to create a more stringent standard of admission than may have otherwise been required. "In determining whether an expert witness is competent or qualified to testify, '[t]he trial court has wide discretion . . ., and the court's determination of this question will not be disturbed on appeal, unless there has been an abuse of this discretion.'" *Lopez v. Reddy*, 2005-NMCA-054, ¶ 14, 137 N.M. 554, 113 P.3d 377 (alteration in original) (omission in original) (citation omitted). "The ruling will not be disturbed . . .[] unless it is manifestly wrong or the trial court has applied wrong legal standards in the determination." *Id.* (alteration omitted) (omission in original) (internal

quotation marks and citation omitted). In any event, Defendants do not argue that a wrong legal standard was applied; they only argue that the standard was misapplied.

**{17}** Defendants argue that the district court abused its discretion in finding that Mr. Stilson's testimony was (1) helpful to the jury; and (2) based on scientific, technical, or other specialized knowledge because Mr. Stilson's testimony was not anchored in the specific facts of this rollover accident.

**{18}** A detailed review of Mr. Stilson's testimony leads us to conclude that the district court did not err and did not abuse its discretion. Mr. Stilson testified that he inspected the vehicle involved in the accident four times and was involved in a "tear[-]down" of the vehicle along with Hyundai representatives. Mr. Stilson personally removed the interior decorative elements of the car and inspected the bare structural elements in order to assess how they performed in the crash. The inspection revealed that the A-pillar weld broke where it connected to the header panel on the roof. Further, the header panel buckled and was pushed past the passenger seat.

**{19}** He also reviewed Hyundai's materials on the vehicle, including pre-production design information, testing protocols and results, and post-production informational materials. Mr. Stilson reviewed all of the material produced by Hyundai in the course of discovery in the case, including video and technical data from a static roof strength test and from a rollover test conducted by Hyundai on other 2002 Accents similar to that involved in this case. The rollover test created conditions similar to a thirty-mile-per-hour crash. Mr. Stilson also reviewed and accepted Hyundai's velocity analysis which calculated the likely speed of the vehicle when it started its roll. The low range calculation was 32.46 miles per hour, and the high range calculation was 34.43 miles per hour.

**{20}** Mr. Stilson also obtained A and B pillars from another 2002 Hyundai Accent as undamaged examples of the subject car. The exemplar A and B pillars were used at trial as demonstrative exhibits. In addition, Mr. Stilson performed his own "farrowing" [sic] analysis on the crashed vehicle in order to measure the amount of damage to the roof in terms of the amount of deflection it suffered. Mr. Stilson analyzed the amount of "rake" and "tumble home" designed into the crashed vehicle. "Rake" is a measure of how much the A-pillar is "rotated rearward" from the vehicle; "tumble home is the angle that the A-[p]illar is rotated inwards toward[] the vehicle." The steepness of the angle affects the relative ability of the A-pillar to resist bending in a crash.

**{21}** Mr. Stilson also noted that the A-pillar on the Hyundai Accent was designed to be hollow. A hollow A-pillar can be filled with foam which can add ten to twenty percent structural strength to the pillar.

**{22}** And, Mr. Stilson noted that Hyundai did not conduct a failure mode effect analysis (FMEA) on the roof design of the Accent. Mr. Stilson testified that FMEA procedures are

standard procedures in the automobile industry and have been so since the 1960s; they are "automatic" as part of design.

{23}   After review of the material and information summarized above, Mr. Stilson opined that:

     A.   The prototype vehicles tested by Hyundai in the rollover test conducted by Hyundai showed that the occupant survival space was compromised, and a "failure mode analysis should have been instigated."

     B.   "[T]his particular roof lacks adequate strength to provide occupant protection under the conditions of this low speed rollover."

     C.   The steep rake of the A-pillar made it easier to bend.

     D.   Hyundai did not incorporate structural foam into the vehicle, and doing so "would have increased at about a 10[-]20 percent level of strength added to the roof to resist crush into the occupant survival space."

     E.   Mr. Baca's "survival space was reduced to way below what would be considered necessary to provide rollover protection in a rollover accident such as the one that occurred in this case.  It[] crushed way below the survival space, what we call normal survival space."

     F.   "[T]he subject Hyundai 2002 Accent roof design is defective and unreasonably dangerous because it lacks adequate strength or crush resistance to provide reasonable protection in this particular low speed rollover to protect the occupant from a crash from this viewpoint."

{24}   Mr. Stilson's testimony specifically related to his investigation of the performance of the Accent's roof in this accident.  Mr. Stilson explained his understanding of vehicle design from specialized knowledge gained through education and employment.  Although Mr. Stilson did not perform his own separate tests on a 2002 Hyundai Accent, his testimony was based in part on his review of rollover testing done by Hyundai on this vehicle, as well as the results of his own testing on another vehicle that employed an integrated roll cage.  The similarity between the observed speed of the vehicle during Hyundai's rollover test (thirty miles per hour) is sufficiently close to the speed in the accident to meet Defendants' assertion that Mr. Stilson's opinion was not reliable because he did not calculate the actual forces at work in the crash.

{25}   Under these facts, we agree with the district court that Mr. Stilson's testimony warranted admission.  As previously noted, the district court had broad discretion in determining Mr. Stilson's qualifications to testify, and it was not an abuse of discretion to deny Defendants' motion to exclude his testimony.

**{26}** With respect to Dr. Burton, Defendants' sole argument on appeal was that, without the predicates as to design defect established by Mr. Stilson's testimony, Dr. Burton's testimony would not have been proper. Having concluded that Mr. Stilson's testimony was properly admitted, Defendants' challenge to the admission of Dr. Burton's testimony also fails.

**2.      Substantial Evidence Supports the Jury's Finding That a Design Defect Caused an Enhanced Injury**

**{27}** Defendants argue that the evidence at trial was insufficient to prove the existence of a design defect which proximately caused an enhanced injury and that the district court erred in failing to grant Defendants' renewed motion for judgment as a matter of law. We will not disturb the district court's denial of Defendants' renewed motion for judgment as a matter of law unless the jury's verdict was unsupported by substantial evidence. *Page & Wirtz Constr. Co. v. Solomon*, 110 N.M. 206, 209, 794 P.2d 349, 352 (1990). "Substantial evidence is such relevant evidence that a reasonable mind would find adequate to support a conclusion." *Landavazo v. Sanchez*, 111 N.M. 137, 138, 802 P.2d 1283, 1284 (1990). "In accordance with the standard of review, when considering a claim of insufficiency of the evidence, the appellate court . . . indulges all reasonable inferences in support of the prevailing party." *Las Cruces Prof'l Fire Fighters v. City of Las Cruces*, 1997-NMCA-044, ¶ 12, 123 N.M. 329, 940 P.2d 177 (filed 1996). "We will affirm the jury's verdict if there is evidence to support it." *Couch v. Astec Indus., Inc.*, 2002-NMCA-084, ¶ 28, 132 N.M. 631, 53 P.3d 398.

**{28}** An automobile manufacturer may be held liable as a successive tortfeasor for any enhanced injury proximately caused by a design defect in its product. *Norwest Bank N.M., N.A. v. Chrysler Corp.*, 1999-NMCA-070, ¶ 11, 127 N.M. 397, 981 P.2d 1215. An enhanced injury is that portion of damage or injury caused by the design defect over and above that which would have resulted from the original accident had the vehicle not been defective. *Duran v. Gen. Motors Corp.*, 101 N.M. 742, 749-50, 688 P.2d 779, 786-87 (Ct. App. 1983), *overruled on other grounds by Brooks v. Beech Aircraft Corp.*, 120 N.M. 372, 902 P.2d 54 (1995).

**{29}** To establish the elements of an enhanced injury against Defendants, Plaintiffs were required to prove: (1) the existence of an enhanced injury, and (2) the degree of enhancement. *Couch*, 2002-NMCA-084, ¶ 35. "The degree of enhancement may be established by proof of what injuries, if any, would have resulted had an alternative, safer design been used." *Id.* Defendants argue the first element was not satisfied because Mr. Stilson's testimony was insufficient to establish that the Accent's roof design was defective and, as a result, Dr. Burton's testimony could not establish that an enhanced injury resulted from any design defect. With respect to the second element, Defendants argue that Plaintiffs failed to establish the degree of injury enhancement by failing to prove what injuries would have resulted from a non-defective design. Defendants' final argument is that Plaintiffs

8

offered insufficient evidence to prove that a defect in the Accent's door latch caused any injury.

**A.      Mr. Stilson's Trial Testimony Was Sufficient to Support Jury Findings That the Accent's Roof Was Defective in Design**

**{30}**     Defendants argue that in order to support any finding of a design defect Mr. Stilson was required to testify that "but for a defective design, the Accent's roof would have crushed to a maximum of three inches," but that he never did.  Defendants assert that such a conclusion would have required specific crush- resistance testing of the Accent by Mr. Stilson, which was never done.  Defendants also assert that, absent an express statement by Mr. Stilson that the roof deflection in the subject vehicle could have been limited to three inches, Dr. Burton's opinion as to enhanced injury was without foundation.  We disagree that such a precise statement or opinion was required of Mr. Stilson to support the jury's finding of design defect and enhanced injury.  The jury could reasonably infer from the testimony in the record that this roof could and should have been designed to maintain a survivable space for passengers in the event of a rollover crash of the kind seen in this accident.  *See Las Cruces Prof'l Fire Fighters*, 1997-NMCA-044, ¶ 12 (stating that "the appellate court . . . indulges all reasonable inferences in support of the prevailing party"); *cf. Hansler v. Bass*, 106 N.M. 382, 386, 743 P.2d 1031, 1035 (Ct. App. 1987) (stating that while a party opposing summary judgment is entitled to have reasonable inferences drawn from the facts, stacking of inference upon inference is not permitted).

**{31}**     Mr. Stilson's ultimate opinion was that the "2002 Accent roof design is defective and unreasonably dangerous because it lacks adequate strength or crush resistance to provide reasonable protection in this particular low speed rollover."  The record reflects that Mr. Stilson detailed his experience in roof testing and the steps he used in arriving at this opinion.  He testified that he had tested several reinforced roofs for their crush resistance.  Specifically, Mr. Stilson testified that in his experience in performing drop tests where vehicles were dropped on their roofs from heights of up to three feet, use of an integrated roll cage reduced roof crush to three inches.  Furthermore, he stated that use of alternatives such as structural foam in the roof's support pillars, general reinforcement of these pillars, or use of an integrated roll cage was feasible in the 2002 Hyundai Accent and could have been used to "provide adequate rollover protection under the conditions of this rollover."

**{32}**     Mr. Stilson examined the subject vehicle and testified that the performance of the vehicle's roof in "this particular [accident]" was substandard.  The roof pillars had deformed after the accident by as much as 10.9 inches inward and downward, and the passenger seat headrest was outside the vehicle's side plane.  He opined that, as a result of the roof crush in this case, Mr. Baca's survival space was reduced to "way below what would be considered necessary to provide rollover protection," or "normal survival space."

**{33}**     Based on Mr. Stilsons's testimony, the jury could have found that the Accent's roof was defective in that it failed to provide adequate survival space.  Such a finding would be

9

sufficient to support an opinion by Dr. Burton that Mr. Baca's death was caused by the inadequate survival space. Assuming that Dr. Burton's opinion required a predicate opinion by Mr. Stilson that roof deflection in this car could have been limited to three inches and indulging all inferences in favor of the verdict, it would have been reasonable for the jury to infer as much from the totality of Mr. Stilson's testimony, in particular his testimony about the performance of roll cages in other vehicles, and that a roll cage would have been feasible in the subject vehicle. Defendants have not demonstrated how such inferences would be improper.

**{34}** On appeal, Defendants put much weight behind the argument that Mr. Stilson's roof-testing knowledge was from static drop tests performed on vehicles other than a 2002 Hyundai Accent and that such tests are not analogous to the rollover at issue here. However, such arguments only go to the weight of the evidence, which is beyond the scope of our review. *See Maestas v. Martinez*, 107 N.M. 91, 93, 752 P.2d 1107, 1109 (Ct. App. 1988) (stating that a reviewing court may not assess the weight of evidence except "[w]here an issue to be determined rests upon the interpretation of documentary evidence"). We also note that in cross-examining Mr. Stilson, Defendants never brought this issue to the jury's attention. Instead, the large majority of the cross-examination focused on Mr. Stilson's experience and prior consultations as an expert witness and on the Accent's door latch.

**B.      Dr. Burton's Testimony Was Sufficient to Establish That a Design Defect Caused Mr. Baca's Enhanced Injury and the Degree of Enhancement**

**{35}** After hearing Mr. Stilson's opinion, the jury heard the testimony of Dr. Burton. He testified that with a non-deformed roof structure, a survivor of a rollover could hang upside down in a vehicle almost indefinitely without asphyxiating. Dr. Burton also showed the jury a scaled computer model that depicted a scenario without any roof crush. According to the model, under this scenario a survivor of a rollover would merely be suspended upside down. Dr. Burton's model also depicted the scene as it existed with Mr. Baca's head outside of the car on the CD changer, and a scenario showing the actual amount of roof deformation after the accident, but with Mr. Baca's head staying inside the vehicle. Based on the model, Dr. Burton testified that the amount of compression suffered by Mr. Baca would not have changed had his head remained in the car because it would have been pressing against the roof rail instead of the CD changer. He also testified that the CD changer did not play a role in causing Mr. Baca's death because it made less than a two inch difference in creating the compression and that if the CD changer was not there his head would have simply settled to the ground.

**{36}** Mr. Baca suffered no fractures to his skull or neck, and although he did suffer a large scalp laceration, a severe injury to his right ear, and several superficial contusions and abrasions, the medical examiner found that none of these injuries would have caused his death. Dr. Burton testified that as a result of the roof crush in this case, Mr. Baca's body was compressed into an inadequate survival space. The distance between the passenger seat cushion and the roof had been reduced to approximately twenty-seven inches, whereas Mr.

10

Baca's upright sitting height required approximately thirty-five inches. Given the body's position and weight distribution, Mr. Baca's airway was pinched off in two places, his diaphragm could not function properly, and his body could not get enough oxygen. According to witnesses, he was actually stuck in this compressed position.

**{37}** Dr. Burton also showed the jury a demonstration of himself hanging upside down in a vehicle while the cabin space was incrementally decreased. He explained that by the time the cabin space was reduced to thirty-seven inches from seat cushion to roof, his neck and chin were so severely bent that he could not breathe, and that in this case, the survival space within the Accent was a full ten inches less.

**{38}** Defendants rely heavily on Dr. Burton's testimony during cross-examination that, if one "could reduce the [Accent's] roof deformation . . . to about three inches[,] . . . there's no reason for [Mr. Baca] to die from mechanical asphyxia[tion]." Pointing back to Mr. Stilson's failure to expressly state that a particular design alternative would have reduced roof crush to three inches in this car, Defendants argue that Plaintiffs' claim fails for lack of causation. Defendants' argument assumes that the only interpretation of Dr. Burton's testimony is that any deflection of more than three inches would have been necessarily fatal. We disagree. Dr. Burton's testimony does not lend itself to such absolute precision. He did not say, and it cannot be reasonably inferred that "three inches is okay, but four inches is fatal." The jury could have interpreted it to mean that a three-inch crush would have clearly posed no danger, but given the way mechanical asphyxiation occurs, there was a gradation of danger up to the ten-inch crush here, which was necessarily fatal. As we previously concluded, Mr. Stilson's general testimony that the Accent's roof was defective because it failed to provide adequate or normal survival space was a reasonable basis for Dr. Burton's testimony. In any event, as we have explained above, to the extent that Dr. Burton's testimony required an opinion that a three-inch maximum crush standard was possible in the subject vehicle through use of an integrated roll cage, such conclusion was reasonably inferred from Mr. Stilson's testimony.

**{39}** Given that none of Mr. Baca's other injuries were life threatening, the evidence is also adequate to support the jury's finding of an enhanced injury—death—from positional asphyxiation, over and above the lacerations, contusions, and abrasions suffered by Mr. Baca as a result of the initial rollover and that death would not have resulted "had an alternative, safer design been used" that preserved adequate survival space. *Couch*, 2002-NMCA-084, ¶ 35.

**{40}** Defendants cite a 1976 case from the Third Circuit and a Delaware case in support of their arguments that Plaintiffs failed as a matter of law to prove the degree of enhancement in this case. However, neither of those cases is helpful here. In *Huddell v. Levin*, 537 F.2d 726, 732 (3rd Cir. 1976), the driver of a 1970 Chevy Nova died as a result of a collision. The driver was at a complete stop when he was rear-ended at a speed of between fifty-five and sixty miles per hour. The theory of causation was that as a result of the collision the decedent's head was thrust backward and impacted a relatively sharp metal

11

edge within the head restraint that caused a skull fracture and damage to the brain. *Id.* at 735. The Third Circuit Court of Appeals ruled that the plaintiff's case failed as a matter of law because there was no evidence of what injuries may have occurred if the decedent's head had instead struck a non-defective head restraint with the same amount of force as generated by an up to sixty mile per hour rear-end collision. *Id.* at 738.

**{41}** *Mazda Motor Corp. v. Lindahl*, 706 A.2d 526 (Del. 1998), presented a similar issue under different facts. In that case, the driver of a Mazda 626 died as the result of a single-vehicle crash in which the car "plunged down an embankment, struck the side of a ditch, flipped end over end and tumbled through the air, striking the ground several times." *Id.* at 528-29. The facts established that the vehicle's driver was intoxicated and traveling at approximately fifty-six miles per hour at the time of the accident. *Id.* at 529. The theory of causation was that the Mazda's seats were defectively designed to collapse in response to the force of a body thrust against them that allowed the decedent to slide up the seat back unrestrained by the seat belt and to be partially ejected from the vehicle. *Id.* However, the plaintiff in that case provided no evidence connecting the seat collapse to the known causes of death—abdominal injuries and head trauma—and no evidence as to whether the decedent would have survived the physiological forces on his body even if an alternative safer seat would have been used. *Id.* at 533-34.

**{42}** In both *Huddell* and *Lindahl*, the facts were such that the victims died as the result of the extreme physiological forces affecting their bodies. The unanswered question with respect to causation in each case was how those physiological forces would have affected them even if some alternative safety feature had been used. It would follow that failure of such proof would cast doubt on the survivability of either accident under any circumstance.

**{43}** Defendants never argued or sought to prove that the physiological forces from the accident were so severe that Mr. Baca could not have survived even if the cabin of the Accent had preserved adequate survival space for him. Defendants did present testimony that Mr. Baca would have died in any event if he were suspended upside down in an unconscious state for as long as he was in the vehicle after the crash. Defendants did not present any testimony that Mr. Baca would necessarily have been rendered unconscious even if the roof of the car had not crushed as much as it did. In contrast, Plaintiffs presented evidence that, had adequate survival space been provided, Mr. Baca would have suffered no life threatening injuries.

**{44}** These different scenarios presented by the testimony present a classic question for the jury to decide. The jury found that the design of the car was defective, that Defendants were negligent, and that the defect and negligence were the cause of "injury or damage to Plaintiff." The jury further determined that "the defect in the 2002 Hyundai Accent or the negligence of Hyundai cause[d] an injury that is distinct from any separate injury caused by the rollover accident."

12

**{45}** The facts of this case demonstrate that this accident was survivable: the driver of the Accent walked away. This evidence suggests that the degree of enhancement in this case is demonstrated by the fatality itself. The jury verdict comports with this view of the evidence. Plaintiffs were not required to engage in speculation or conjecture as to how Mr. Baca's *non*-life threatening injuries may have been different if, for example, an integrated roll cage had been used in the subject vehicle. *See Lindahl*, 706 A.2d at 532 (recognizing the impossible burden of separating hypothetical injuries which never occurred from the total actual injuries in a crash).

**{46}** Defendants also argue that Plaintiffs were required to prove that a design defect in the passenger-side door latch directly or indirectly caused Mr. Baca's death. The issue relating to the door latch was developed below through Mr. Stilson, who explained his opinion that the Accent's door came open during the rollover as the result of a defect. However, having found sufficient evidence to support a conclusion that a design defect in the roof structure alone caused the enhanced injury of death, we need not address whether Plaintiffs adequately proved that the door latch was also defective. In any event, Dr. Burton's testimony was that, with respect to the amount of survival space available after the accident, it made no difference whether Mr. Baca's body would have remained inside the vehicle because the roof rail had collapsed down to the headrest.

**C.     It Was Not Reversible Error to Allow the Jury to Hear Evidence on a Potential Alternative Theory of Liability Relating to the Accent's Door Latch**

**{47}** Defendants finally argue that the discussion about the door latch should have never been presented to the jury because it was prejudicial. Assuming that the issue of a defective door latch should not have gone to the jury, we see no reversible error. The jury here was not requested to find whether the roof or doors specifically were defective or how Defendants were specifically negligent. The questions asked were general: "Was there a defect in the 2002 Hyundai Accent?" "Did Hyundai breach the implied warranty of merchantability?" "Was Hyundai negligent?" In that regard, the special verdict form in this case amounted to a general verdict.[1]

---

[1]In this regard the "theory of the case" instruction was similarly general:

> To establish the claim of a defective product on part of Defendants . . ., . . . Plaintiffs have the burden of proving that the 2002 Hyundai Accent was defective because it presented an unreasonable risk of injury during this accident.

> To establish the claim of breach of implied warranty on the part of Defendants . . ., . . . Plaintiffs have the burden of proving the following contentions: (1) . . . Defendants were suppliers who regularly dealt in products of the kind that they were selling or held themselves out as having

**{48}** A general verdict may be affirmed under any theory supported by evidence unless an erroneous jury instruction was given. *Salinas v. John Deere Co.*, 103 N.M. 336, 341, 707 P.2d 27, 32 (Ct. App. 1984). In *Salinas*, the plaintiff was injured when the chain on a corn harvester caught his leg while he was removing "down corn" from the front of the machine. *Id.* at 338, 707 P.2d at 29. The plaintiff presented three theories of product defect that could have resulted in liability of the manufacturer of the harvester; the third of which was that the inclusion of a "corn saver" on the front of the harvester would have made it safer by requiring it to make less frequent stops for the removal of "down corn." *Id.* at 339, 341, 707 P.2d at 30, 32. On appeal, the manufacturer argued that instructing the jury on all three theories of defect was erroneous because there was insufficient evidence to support the third theory. *Id.* at 341, 707 P.2d at 32. We concluded that the jury could have reasonably found that the harvester lacked an available device such as a corn saver, which would have made it safer for its intended use, and that the plaintiff was entitled to rely on circumstantial evidence that the absence of such a device created an unreasonable risk of injury. *Id.* Thus, we affirmed the district court's entry of judgment in favor of the plaintiff concluding that instructing the jury on all three theories was not erroneous even though it was unclear under the general verdict which theory the jury relied upon. *Id.* at 341-42, 707 P.2d at 32-33.

**{49}** This case presents an even clearer circumstance of harmless error. The "theory of the case" instruction given to the jury does not present any specific theories of product defect or negligence tied to the roof of the car or the door. The nature of any actionable defect and/or negligence was left to the jury to decide based on the evidence. In this situation, we must assume the jury accepted the theory argued by counsel that was supported by substantial evidence. Assuming there was insufficient evidence of causation between any door-latch defect and Mr. Baca's injuries, we assume the jury did not rely on the door for its finding of product defect and negligence.

### 3.    The Jury Was Properly Instructed

**{50}** Acknowledging that no case to date has done so in New Mexico, Defendants argue that we should adopt the Restatement (Third) of Torts and require, as an element of the tort, a specific showing of a reasonable alternative design in strict products liability design defect

---

special knowledge or skill concerning the product; and (2) . . . product was defective and not fit for the ordinary purposes for which such product is used.

To establish the claim of negligence on the part of the Defendants, Plaintiffs have the burden of proving that the Defendants failed to possess or apply the knowledge available to reasonable vehicle manufacturers to avoid foreseeable risks of injury in connection with the design, testing and/or distribution of the 2002 Hyundai Accent.

cases. Based on this argument, Defendants assert that the district court erred in refusing to give the following jury instruction:

> A product is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe.
>
> . . . .
>
> The test is whether a reasonable alternative design would, at reasonable cost, have reduced the foreseeable harm posed by the product and if so, whether the omission of the alternative design by the seller rendered the product not reasonably safe.

Defendants assert that this instruction more accurately describes the "risk-benefit" approach to strict products liability already embedded in New Mexico law; making "explicit what is already implicitly required."

**{51}** In *Brooks*, our Supreme Court examined whether so-called crash worthiness cases involving theories of inadequate or improper design could sound in strict product liability as well as negligence. Overruling *Duran*, in this regard, the Court ruled that strict products theories were an appropriate avenue of potential liability. *Brooks*, 120 N.M. at 373-74, 902 P.2d at 55-56. In reaching its decision, the Court conducted a thorough review of the policies underlying products liability as a cause of action in general. *Id.* at 375-77. It thus examined whether those policies would, on balance, be furthered in the context of "design-defect claims" and found that they would. *Id.* at 377-79.

**{52}** In the course of this discussion, the Court also reviewed New Mexico's requirements for proof of an actionable product defect. The Court framed its discussion in light of its then-current product liability jury instructions, in particular UJI 13-1407 NMRA. *Id.* at 379, 902 P.2d at 61. UJI 13-1407 remains unaltered in substance and is the definitional instruction given to the jury in this case. Pursuant to *Brooks*, we conclude that Defendants' proposed jury instruction was properly denied because it is in conflict with established law and because the instruction given adequately and correctly conveyed the applicable legal standard.

**{53}** UJI 13-1407 provides:

> An unreasonable risk of injury is a risk which a reasonably prudent person having full knowledge of the risk would find unacceptable. This means that a product does not present an unreasonable risk of injury simply because it is possible to be harmed by it.

15

[The design of a product need not necessarily adopt features which represent the ultimate in safety. You should consider the ability to eliminate the risk without seriously impairing the usefulness of the product or making it unduly expensive.]

Under products liability law, you are not to consider the reasonableness of acts or omissions of the supplier. You are to look at the product itself and consider only the risks of harm from its condition or from the manner of its use at the time of the injury. [The question for you is whether the product was defective, even though the supplier could not have known of such risks at the time of supplying the product.]

{54}    Under New Mexico law, the existence of a reasonable alternative design is a relevant consideration by a jury but, contrary to Defendants' argument, a specific finding on this issue is not required. *Morales v. E.D. Etnyre & Co.*, 382 F. Supp. 2d 1278, 1284 (D.N.M. 2005). In *Brooks*, the New Mexico Supreme Court made clear that a "defect giving rise to strict products liability is not measured by comparison with a prototype." 120 N.M. at 379, 902 P.2d at 61. The Court specifically declined to narrowly define a defect in a strict products liability case in terms of a "reasonable alternative." *Id.* Instead, the Court favored what it termed the "unreasonable-risk-of-injury" test found in UJI 13-1407 that would allow "argument under any rational theory of defect." *Brooks*, 120 N.M. at 379, 902 P.2d at 61. While a jury is required to make risk-benefit calculations, consideration of alternative designs is but one of several risk-benefit considerations that a jury may balance in determining whether a product created an unreasonable risk of injury. The Court favorably noted a list of seven risk-benefit considerations found in the Committee Comment for UJI 13-1407:

(1) the usefulness and desirability of the product; (2) the availability of other and safer products to meet the same need; (3) the likelihood of injury and its probable seriousness, i.e., "risk"; (4) the obviousness of the danger; (5) common knowledge and normal public expectation of the danger (particularly for established products); (6) the avoidability of injury by care in use of the product (including the effect of instructions or warnings); and (7) the ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive.

*Brooks*, 120 N.M. at 379-80 n.2, 902 P.2d at 61-62 n.2. The seventh consideration most directly addresses what a jury may consider with respect to alternative design, and this language is included in the actual jury instruction as something the jury "should consider." The jury in this case was instructed accordingly. Thus, the jury instructions proposed by Defendants were properly denied because they misstated the test for a design defect by focusing the jury too narrowly on a reasonable alternative design. To the extent that such considerations should be made by the jury, UJI 13-1407 supplies the proper analysis.

16

**{55}** We note that in 2009 the New Mexico Supreme Court adopted a revision to UJI 13-1407's companion instruction, UJI 13-1406 NMRA (2009), and in doing so reaffirmed in a use note that "UJI 13-1407[] must be used in every strict products liability case based upon Restatement (Second) of Torts § 402A." UJI 13-1406 (use note); *see Supreme Court Order No.* 09-8300-011, effective May 15, 2009. Given that our Supreme Court specifically addressed the relevant language of UJI 13-1407 in *Brooks*, this Court is without authority to amend this jury instruction in favor of the conflicting instruction proposed by Defendants. *See State v. Parish*, 118 N.M. 39, 47, 878 P.2d 988, 996 (1994) (stating that the Court of Appeals may "amend, modify, or abolish" uniform jury instructions only when they have not been specifically addressed by the Supreme Court on appeal (internal quotation marks omitted)).

**{56}** Defendants argue that, instead of relying on the older case of *Brooks*, this Court should adopt its rationale from *Morales*. The court in *Morales* reasoned that since New Mexico courts had previously cited favorably to other sections of the Restatement (Third) of Torts on strict products liability law, it was "fair to say that . . . the Restatement (Third) accurately reflect[s] New Mexico's strict products liability law[,]" and that if presented with the question, the New Mexico Supreme Court "would most likely adopt the Restatement (Third)." *Morales*, 382 F. Supp. 2d at 1282-83. We need not forecast the accuracy of the *Morales* prediction in order to affirm the district court's decision in this case. *Brooks* had already recognized that New Mexico's existing law, at least to some degree, applies the risk-utility considerations advocated by the Restatement (Third). *See Brooks*, 120 N.M. at 380, 902 P.2d at 62 (stating that the existing jury instruction allows "proof and argument on all of the factors suggested by the Restatement (Third) of Torts as relevant in determining whether the omission of a reasonable alternative gave rise to an unreasonable risk of injury").

**{57}** Furthermore, in *Morales*, the court recognized—we think consistently with *Brooks*—that to the extent that evidence of an alternative design is required, New Mexico courts do not require a "rigid showing in the plaintiff's prima facie case." *Morales*, 382 F. Supp. 2d at 1284. The court in *Morales* appeared more concerned with the idea that "a plaintiff could come to court and merely criticize a product," and in that context the court stated its belief that "New Mexico law required the plaintiff to propose an alternative design." *Id.* at 1283-84. As previously noted, Plaintiffs in this case did more than merely criticize the design of the Accent's roof structure. They identified alternatives that could have been implemented to improve its performance in a rollover. This evidence was admitted as relevant to the determination of an enhanced injury. *See Couch,* 2002-NMCA-084, ¶ 35 (stating that "enhancement may be established by proof of what injuries, if any, would have resulted had an alternative, safer design been used"). Thus, the concern identified in *Morales* does not exist in this case. The district court properly declined to give the additional jury instruction proposed by Defendants below.

**CONCLUSION**

17

**{58}** For the foregoing reasons, we affirm the judgment of the district court.

**{59}   IT IS SO ORDERED.**

_____

**MICHAEL D. BUSTAMANTE, Judge**

**WE CONCUR:**

_____

**JONATHAN B. SUTIN, Judge**

_____

**LINDA M. VANZI, Judge**

**Topic Index for _Bustos v. Hyundai Motor Co._, Docket No. 28,240**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-SB | Substantial or Sufficient Evidence |
| | |
| **EV** | **EVIDENCE** |
| EV-EW | Expert Witness |
| EV-SC | Scientific Evidence & Daubert Standard |
| | |
| **JI** | **JURY INSTRUCTIONS** |
| JI-CI | Civil Jury Instructions |
| | |
| **TR** | **TORTS** |
| TR-NG | Negligence |
| TR-PR | Products Liability |