This memorandum opinion was not selected for publication in the New Mexico Reports.  Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions.  Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**EDWIN GURULE, individually, and as personal representative of the estate of SAMMY GURULE, deceased,**

Plaintiff-Appellee/Cross-Appellant,

v.                                                                    **NO. 29,296**

**FORD MOTOR COMPANY,**

Defendant-Appellant/Cross-Appellee.

**APPEAL FROM THE DISTRICT COURT OF RIO ARRIBA COUNTY**
**Timothy L. Garcia, District Judge**

Law Office of James B. Ragan
James B. Ragan
Corpus Christi, TX

Arrazolo Law Firm, P.C.
Gilbert Arrazolo
Albuquerque, NM

for Appellee

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Edward Ricco

Jeffrey M. Croasdell
Albuquerque, NM

Dickinson Wright PLLC
Robert W. Powell
Detroit, MI

for Appellant

**MEMORANDUM OPINION**

**WECHSLER, Judge.**

Defendant Ford Motor Company appeals, arguing that the district court erred in denying Defendant judgment as a matter of law because Plaintiff Edwin Gurule, individually and as personal representative of the Estate of Sammy Gurule (Gurule), failed to provide sufficient evidence that the alleged defect caused Gurule's enhanced fatal injuries and failed to provide sufficient evidence that an alternative design would have prevented the fatal injuries. Defendant further argues that the district court erred in admitting expert testimony of two experts who were unqualified and relied on methods that were unreliable. Plaintiff cross-appeals, arguing that the district court erred in granting Defendant's motion regarding punitive damages. We hold that Plaintiff presented sufficient evidence for a jury to find that the alleged defect caused Gurule's fatal injuries. We further hold that the district court did not err in admitting expert testimony of Dr. Michael Huerta and Mr. William Patterson or in granting

Defendant's motion regarding punitive damages. Therefore, we affirm.

**BACKGROUND**

On November 10, 2006, Gurule's 1993 Ford Ranger pickup truck left the highway and rolled over, caving in the roof and killing Gurule. The vehicle initially entered a passenger-side leading roll, but because the vehicle was airborne, it first hit the ground on the driver's side roof. Plaintiff sued Defendant for wrongful death, alleging strict products liability regarding the allegedly defective roof and negligence regarding the design and testing of the roof. Plaintiff sought both compensatory and punitive damages. The parties disputed at trial whether Gurule's head was inside the vehicle or outside of it when he hit the ground, but on appeal, the parties agree that, for purposes of this appeal, his head was inside. The parties do not dispute that Gurule's death was caused by "'blunt force injury to the head'" due to a "'sudden impact.'" They do dispute, however, how Gurule's head impacted the vehicle. Defendant contends that Gurule's head was "'touching the roof'" of the vehicle at the time it first impacted the ground and, consequently, caused the brain to hemorrhage and the skull to fracture. Plaintiff contends that Gurule's head was struck by the collapsing roof of the truck due to the "inward crushing and buckling of the roof in a V shape."

3

At trial, Plaintiff presented the testimony of various experts, attempting to show that the collapsing roof caused Gurule's injuries and that, if the roof had not collapsed, Gurule would have walked away from the accident. Defendant contested the admission of much of this testimony through motions in limine, objections at trial, and post-verdict motions for judgment notwithstanding the verdict or new trial. The district court denied the motions and overruled the objections, allowing testimony of Plaintiff's experts. After Plaintiff's case, Defendant filed a motion for directed verdict, which the district court granted with regard to Plaintiff's claim for punitive damages.

The jury ultimately found for Plaintiff on strict liability for Plaintiff's product liability claim and for negligence in design and manufacture. The jury awarded compensatory damages to Plaintiff for $8.5 million. Defendant filed a motion for judgment as a matter of law or, alternatively, for a new trial, which the district court denied. Defendant appeals and Plaintiff cross-appeals.

**SUFFICIENCY OF THE EVIDENCE**

Defendant argues that the district court erred in denying its motion for judgment as a matter of law because Plaintiff failed to prove that the alleged defect caused the fatal injuries. Defendant additionally argues that Plaintiff failed to present "evidence that an alternative, non-defective roof design would have limited roof crush in this

4

accident sufficiently to prevent the fatal injuries." We review whether there was sufficient evidence to uphold a jury verdict "by examining whether the verdict is supported by such relevant evidence that a reasonable mind would find adequate to support a conclusion." *Sandoval v. Baker Hughes Oilfield Operations, Inc.*, 2009-NMCA-095, ¶ 12, 146 N.M. 853, 215 P.3d 791 (internal quotation marks and citation omitted). We review the evidence in a light favoring the verdict and resolve conflicts in favor of the prevailing party. *Id.*

Defendant first argues that Plaintiff did not present sufficient evidence to support a finding that the alleged roof defect caused the enhanced injuries to Gurule. This Court dealt with a similar argument in *Couch v. Astec Industries, Inc.*, in which the defendant argued that "there was insufficient evidence from which the jury could reasonably determine that [the d]efendant was responsible for [the p]laintiff's 'enhanced injury' or that [the d]efendant was negligent or strictly liable to [the p]laintiff." 2002-NMCA-084, ¶ 2, 132 N.M. 631, 53 P.3d 398. In *Couch*, the plaintiff sued the defendant, a manufacturer of asphalt plants and road paving equipment, for injuries sustained after the plaintiff became entangled in a machine manufactured by the defendant, arguing that the asphalt plant's protective guard was inadequate and that the plant should have been equipped with an emergency pull cord on the conveyor belt, which would have allegedly resulted in less extensive injuries. *Id.* ¶¶ 3, 5-7.

In *Couch*, we held that in order to establish an "enhanced injury," a plaintiff must prove "(1) that the defective design caused injuries over and above those which otherwise would have been sustained, and (2) the degree of enhancement." *Id.* ¶ 35. We further stated that "[t]he degree of enhancement may be established by proof of what injuries, if any, would have resulted had an alternative, safer design been used." *Id.* We concluded that the evidence supported an inference that the defendant was exposed to more extensive injuries and that, therefore, "the jury reasonably could have found that [the p]laintiff proved his claim for enhanced injury due to the absence of a pull cord." *Id.* ¶¶ 38-39. Acknowledging that the defendant presented evidence that supported a different outcome, we reiterated that "[t]he question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached." *Id.* ¶ 39 (alteration in original) (internal quotation marks and citation omitted).

Similar to the defendant in *Couch*, Defendant argues that there is insufficient evidence to support a jury's finding that the allegedly excessive roof crush caused Gurule's fatal injuries. In support of its argument, Defendant asserts that "there was no conflict that excessive roof crush did *not* cause the fatal injuries because Plaintiff's own expert testified unequivocally that it did not." Defendant clarifies that Plaintiff's expert "testified unambiguously" that Gurule's head was touching the roof of the

6

vehicle when it hit the ground and that the initial roof deformation caused the injuries, "not the allegedly excessive crush as the roof continued to deform."

However, although Defendant makes an argument for its interpretation of the facts, other facts exist that support the jury's verdict. Dr. Joseph Peles, Plaintiff's expert in bioengineering, testified that Gurule's injury occurred because of the V-shape buckling of the roof, which introduced the enhanced, fatal component. Dr. Peles further stated that the roof of Gurule's vehicle was not strong enough to resist the combination of the lateral and vertical force on the roof caused by the impact, that a strong roof would have only deformed in a shape "conform[ing to the] ground," and that such a deformation would not have caused sufficient injury to Gurule to cause death. Additionally, Dr. Peles testified that if the roof crush were limited to two to three inches, the V-buckling would likely be limited and prevented. Although Plaintiff concedes that, at the point of impact, Gurule's head was "of course, in contact with the roof header panel," as he argued at trial, Plaintiff contends that the "critical factor" was the "extra component of force resulting from [the] V[-]buckling of the roof structure." Dr. Peles was asked to clarify his testimony by the district court and he testified that, if the vehicle had a strong roof, the V-buckling would not have initially occurred. Specifically, Dr. Peles stated that the "original cave-in that[] caus[ed] the injury" would not have occurred because, in a strong roof, the roof

conforms to the ground, whereas in a weak roof, it can buckle. Combined with Dr. Ian Paul's testimony that Gurule's fatal injury was consistent with Gurule's head being struck by the collapsing roof of the truck, a jury could reasonably conclude that the roof was unreasonably weak, that the excessive roof crush caused the V-buckling, that the V-buckling would not have occurred in a stronger roof, and that the V-buckling caused Gurule's fatal injuries. Although Defendant presents evidence and arguments to support its interpretation of the facts, on appeal, we do not reweigh the evidence or substitute our judgment for that of the jury, provided there is sufficient evidence to support the verdict. *State v. Fuentes*, 2010-NMCA-027, ¶ 13, 147 N.M. 761, 228 P.3d 1181; *see also State v. Lucero*, 2010-NMSC-011, ¶ 8, 147 N.M. 747, 228 P.3d 1167 (stating that it is the province of the jury "to weigh and resolve conflicting evidence and testimony" (internal quotation marks and citation omitted)).

Defendant further argues that Plaintiff needed to show that the "residual" roof crush, that occurred after the initial roof crush, caused Gurule's injuries in order to prove enhanced injury. However, Defendant presents no authority, and we are aware of no authority, that asserts that an enhanced injury case requires proof of a defect that causes an injury later in time, rather than greater in force. *See In re Adoption of Doe*, 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984) (stating that we do not review arguments unsupported by authority on appeal). Defendant attempts to bolster its

8

argument by stating that Plaintiff's expert, Dr. Peles, admitted that the "initial cave-in" was the cause of Gurule's fatal injuries. Although we do not agree with this iteration of Dr. Peles' testimony, we see no reason to conclude that the alleged V-buckling that occurred at impact, which caused Gurule's injuries, was not a result of the excessive roof crush in dimension, rather than in time. Plaintiff asserts that "the excessive roof crush that killed . . . Gurule was [the] V[-]buckling, or caving in, which occurred because the roof was too weak." In other words, the excessive roof crush was the excessive amount the roof crushed in due to the allegedly defective design. As discussed above, Plaintiff presented sufficient evidence with which a jury could agree with this conclusion. Again, we do not reweigh the evidence or substitute our judgment for that of the jury. *Fuentes*, 2010-NMCA-027, ¶ 13.

Defendant next argues that Plaintiff presented no evidence that an alternative design would have prevented the fatal injuries. Defendant asserts that the two alternatives that were presented by Dr. Huerta, Plaintiff's expert in structural engineering, did not prove that the roof crush would have been limited "in this accident to two or three inches." However, Dr. Huerta testified that, after conducting testing on exemplar vehicles, he concluded that the vehicle was unreasonably dangerous and that a feasible and affordable alternative design would have prevented the enhanced and fatal injuries. He additionally testified that moderate reinforcement

of the roof would have improved its strength and limited intrusion of the roof into the passenger area to between two and three inches. Defendant argues that Dr. Huerta's testimony was theoretical and that the tests performed did not meet the requisite standard. But again, although Defendant presents viable arguments for its perspective, it is for the jury to weigh evidence and resolve conflicting testimony. *Lucero*, 2010-NMSC-011, ¶ 8. As such, in this case, the evidence presented was sufficient that a reasonable jury could conclude that Dr. Huerta's testimony presented a viable alternative that would have prevented the fatal injuries.

**EXPERT TESTIMONY**

**Dr. Huerta**

Defendant argues that the district court erred in admitting Dr. Huerta's prejudicial expert testimony. Plaintiff initially asserts that Defendant did not preserve this argument for appeal. Plaintiff contends that Defendant did not move to strike testimony and that its post-trial motions regarding the testimony came "too late." However, Defendant did object to Dr. Huerta's opinions at trial, as well as in its post-verdict motion. Indeed, Defendant asserted at trial that Dr. Huerta was not qualified to render opinions regarding whether a roof design was safe. The district court overruled the objection, and Defendant was not required to repeat its objection since the purpose of the preservation rule had been met. *See State v. Soto*, 2007-NMCA-

077, ¶ 14, 142 N.M. 32, 162 P.3d 187; *see also* Rule 12-216(A) NMRA ("To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked, but formal exceptions are not required[.]").

We review admissibility of evidence, including expert opinion, for an abuse of discretion. *State v. Alberico,* 116 N.M. 156, 169, 861 P.2d 192, 205 (1993). An abuse of discretion occurs when a ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case. *State v. Campbell*, 2007-NMCA-051, ¶ 9, 141 N.M. 543, 157 P.3d 722. We focus our inquiry on whether the expert's testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." *State v. Hughey*, 2007-NMSC-036, ¶ 17, 142 N.M. 83, 163 P.3d 470 (internal quotation marks and citation omitted).

In determining whether to admit non-scientific expert testimony under Rule 11-702 NMRA, we look to whether (1) the expert is qualified, (2) the testimony will assist the trier of fact, and (3) the testimony is limited to the area of scientific, technical, or other specialized knowledge in which they are qualified. *Fuentes*, 2010-NMCA-027, ¶ 23. Defendant argues that Dr. Huerta was not qualified to testify regarding automotive design and safety and that the testimony was not based on a reliable foundation. We address each in turn.

Defendant first asserts that Dr. Huerta was not qualified. Dr. Huerta has a Ph.D

11

in mechanical engineering and is employed as a mechanical engineering consultant. Specifically, Dr Huerta has an educational background and professional experience in stress analysis and structural analysis, a discipline that is used to determine how a structure responds to loading conditions, to calculate the strengths, deflections, and stresses. Additionally, he has taught stress analysis, structural engineering, and finite element analysis at the University of Texas, El Paso.

Defendant concedes that Dr. Huerta has professional experience in structural analysis, but asserts that he has no education, training, or experience specifically in motor vehicle design or passenger safety. Defendant contends that the district court erred in concluding that Dr. Huerta's qualifications went to weight not ability to testify because *Alberico* "makes clear that a lack of qualifications renders the opinions inadmissible." *See* 116 N.M. at 166, 861 P.2d at 202. Although we acknowledge that Dr. Huerta's qualifications may not typically apply to vehicle design or passenger safety, the principles of structural analysis and stress analysis do "apply across the board to all fields of engineering." As he testified, Dr. Huerta evaluated the structural integrity of the exemplar 1993 Ranger Gurule was driving at the time of the accident and determined in what areas the roof might fail structurally and how to design a structure so as not to fail. As Defendant additionally establishes, Dr. Huerta testified regarding the cost to incorporate his proposed reinforcements into a production roof

12

and the weight it would add to the vehicle, as well as his "hazard analysis" on the vehicle's roof design and the technological and economical feasibility of a safer design. Although Dr. Huerta may not have extensive background in vehicle design, Defendant made no objection as to Dr. Huerta's qualifications as a structural engineer. On appeal, Defendant presents us with no authority, and we find no authority, that states that an expert in the "strength and integrity of structures" may not testify as to the strength and integrity of a specific type of structure, such as a vehicle. *See In re Adoption of Doe*, 100 N.M. at 765, 676 P.2d at 1330 (stating that we do not review arguments unsupported by authority on appeal). Indeed, Dr. Huerta was qualified as an expert in mechanical engineering, and we cannot say that the district court abused its discretion in allowing him to testify as to the safety of a structure without having a specific background in vehicle design and safety. *Cf. Couch*, 2002-NMCA-084, ¶ 14 (qualifying a non-engineer expert with no experience in designing machinery that caused injuries to testify regarding inadequacy of safety mechanisms on a paving machine based on experience and education in occupational safety).

Defendant next asserts that Dr. Huerta's opinions were not reliable. Defendant states that Dr. Huerta's opinion that an alternative roof design would have limited roof crush had "no reliable basis or methodology because it was not based on any testing or calculation of forces." Under the third prerequisite to the admissibility of expert

13

testimony, the proponent of expert testimony must show that the expert testimony has "a reliable basis in the knowledge and experience of his discipline." *Alberico,* 116 N.M. at 167, 861 P.2d at 202 (internal quotation marks and citation omitted). "[W]hen testing the reliability of non-scientific expert testimony, . . . the court must evaluate [the] expert's personal knowledge and experience to determine whether the expert's conclusions on a given subject may be trusted." *State v. Torrez*, 2009-NMSC-029, ¶ 21, 146 N.M. 331, 210 P.3d 228.

Dr. Huerta testified in detail regarding the technique and methodology he used in evaluating the structural integrity of the exemplar 1993 Ranger. He testified that he conducted drop tests, in which he suspended two vehicles, twenty-four inches and eighteen inches respectively, above a concrete surface and oriented to test the portion of the vehicle at issue. As a result of both tests, the vehicles suffered from deformation of the structure in a similar manner in which Gurule's vehicle had deformed. Defendant argues that this testing methodology has been "rejected in the relevant scientific field by the Society of Automotive Engineers, because it is not repeatable and does not relate to injury causation in rollovers." However, Dr. Huerta's testimony was not admitted to prove injury causation. It was admitted for the purpose of showing that the roof was structurally weak and could have been strengthened at a reasonable cost.

14

Defendant further asserts that drop tests are unreliable and invalid in judging the safety of roof structures in rollovers. However, Dr. Huerta gave specific instructions on how he conducted his drop tests and was subject to cross-examination on his methodology. Further, there was evidence that drop tests have been performed by automobile manufacturers to test roof strength for various purposes, including by Defendant. *See, e.g.*, *Styles v. Gen. Motors Corp.*, 799 N.Y.S.2d 38, 40 (App. Div. 2005) ("[I]t is uncontroverted that 'drop testing' of vehicles to determine the crashworthiness of roofs is a routine, widely accepted scientific technique."). We therefore cannot say that the district court abused its discretion in allowing Dr. Huerta's testimony due to a lack of a reliable basis in the knowledge and experience of his discipline.

Defendant also attempts to present Dr. Huerta's testimony as nothing more than an untestable, unreliable, and therefore, inadmissible factual conclusion that Gurule was fatally injured as a result of the weakness in the vehicle's structural integrity. However, as noted, Dr. Huerta's testimony was admitted for the purpose of evaluating the structural integrity of the roof, not injury causation. Although Dr. Huerta did state that the vehicle was "unreasonably dangerous," as an expert qualified in mechanical engineering and the structural analysis of the vehicle and relying on his tests of the structural integrity of the vehicle, he was permitted to testify as to this opinion. *See*

15

Rule 11-702 ("[A] witness qualified as an expert . . . may testify thereto in the form of an opinion or otherwise."); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993) ("[A]n expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."). **Mr. Patterson**

Defendant also argues that the district court erred in admitting Patterson's expert testimony regarding hedonic damages because (1) testimony purporting to quantify the value of life is not a proper subject of expert testimony because this type of expert testimony does not assist the jury and is not sufficiently tailored to the life of a specific plaintiff, (2) Patterson was not qualified, and (3) Patterson's opinions were unreliable pursuant to *Alberico* because they were not based on an established scientific methodology or procedure and the methodology has not been widely accepted in economic literature. Plaintiff again asserts that Defendant did not preserve its argument regarding the admissibility of Patterson's testimony. However, Plaintiff concedes that Defendant filed a motion in limine to exclude the testimony of Patterson, that Defendant objected at trial to Patterson testifying regarding hedonics, and that Defendant again objected that Patterson should not be permitted to discuss enjoyment of life. Plaintiff asks this Court to "specifically adopt the rule . . . that [Defendant]'s motion in limine did not preserve its claim of error in the admission of . . . Patterson's testimony." We decline to do so. *See Robertson v. Carmel Builders*

16

*Real Estate*, 2004-NMCA-056, ¶¶ 33, 50, 135 N.M. 641, 92 P.3d 653 (stating that issues were preserved in motions in limine).

Patterson testified that economists have used a variety of methods to place an economic value on a human life and that there are various economic studies that have attempted to quantify the value of an entire human life. Patterson further testified that there is a component of the total value of a human life attributed to the pleasure of life, meaning the "slice" of time spent pursuing leisure activities. According to Patterson, the total value of life is the sum of an individual's earning capacity over the lifetime, the value of household services an individual produces, and the pleasure of life component. He next testified that there are a number of studies, aside from those that value an entire human life, that provide benchmarks to place an economic value on the pleasure of life component. He testified that the study measuring the enjoyment of life component that he "like[s] the best" is a meta-study conducted in 1988 that analyzed the results of 67 individual studies that valued human lives based on willingness to pay studies, subtracted the earning capacity and household services portion, and attributed the rest to the enjoyment of life component. The study concluded that the average total value for the enjoyment of life component was $55,000 per year in 1988, or roughly $100,000 in 2008 dollars. He then testified that he utilizes this $100,000 benchmark as an upper range "to aid the finders of fact, to aid the jury in cases like

17

this." Applying this figure to the remainder of Gurule's life, Patterson concluded that "[i]f you [the jury] believe that the value of pleasure of life is $100,000 per year . . . it comes to $5.99 million" and that if the jury believes the value of life component is "only worth [$]10,000 per year, the present value of the loss across . . . Gurule's lifetime is about $598,680." The jury awarded $5.8 million as damages for "life apart from his earning capacity."

Defendant first contends that testimony purporting to quantify the value of enjoyment of life, or hedonic damages, is not the proper subject of expert testimony. Defendant relies on *Couch*, 2002-NMCA-084, ¶ 20, for the proposition that hedonic damage calculations are analogous to calculations for damages for pain and suffering, which is a determination that is solely within the province of the jury and not a proper subject of expert testimony. However, this Court has held that "it is not improper for the [district] court to permit an economist to testify regarding his or her opinion concerning the economic value of a plaintiff's loss of enjoyment of life." *Sena v. N.M. State Police*, 119 N.M. 471, 478, 892 P.2d 604, 611 (Ct. App. 1995). Indeed, the expert challenged in *Couch* offered a "range of values" and thus provided the jury with calculations. 2002-NMCA-084, ¶ 18.

Defendant further argues that the methodology used by Patterson "'failed to meet the *Alberico* standard of scientific reliability.'" Our Supreme Court has applied

a nonexclusive, four-factor test in determining the scientific reliability of expert testimony. We consider

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known potential rate of error in using a particular scientific technique and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or technique has been generally accepted in the particular scientific field.

*Lee v. Martinez,* 2004-NMSC-027, ¶ 18, 136 N.M. 166, 96 P.3d 291 (internal quotation marks and citation omitted). In particular, Defendant contends that (1) the scientific reliability of the meta-study relied upon by Patterson for the $100,000 benchmark fails to meet the reliability standard of *Alberico*, (2) the method by which Patterson calculated the loss of enjoyment of life for the bottom number of the range, by moving the decimal point on the $100,000 benchmark to $10,000, had no basis and thus fails the scientific reliability standard of *Alberico* (3) the methodology used by Patterson has not been widely accepted in the scientific literature, and (4) courts have almost uniformly rejected proposed expert testimony purporting to quantify hedonic damages because it is unreliable.

However, in *State v. Torres*, 1999-NMSC-010, ¶¶ 43-44, 127 N.M. 20, 976 P.2d 20, our Supreme Court limited the application of the *Alberico* standard to expert testimony that requires scientific knowledge. *Torres* adopted the rationale of *Compton v. Subaru of America, Inc.*, 82 F.3d 1513, 1518 (10th Cir 1996), that

*Alberico* does not extend to expert testimony based on experience or non-scientific knowledge, and New Mexico has continued to recognize this principle despite *Compton* being overruled by *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). *See Bustos v. Hyundai Motor Co.*, 2010-NMCA-090, ¶ 14, 149 N.M. 1, 243 P.3d 440, *cert. granted*, 2010-NMCERT-010, 149 N.M. 65, 243 P.3d 1147.  Thus, in examining the expert testimony of Patterson, we do not apply the *Alberico* standard of scientific reliability.  Patterson's testimony was not based on scientific knowledge, but instead was based on his specialized knowledge and experience as an economist regarding the interpretation and application of studies that apply economic concepts to value a human life.  *See State v. Aleman*, 2008-NMCA-137, ¶ 18, 145 N.M. 79, 194 P.3d 110 ("Specialized knowledge, while it may result in conclusions or opinions drawn from observations and experience with scientific facts, deals more with the technical application, rather than the theoretical application of facts." (internal quotation marks and citation omitted)).  We therefore address the reliability of Patterson's testimony in the context of whether a proper foundation was laid as to whether there was "a reliable basis in the knowledge and experience of his discipline." *Alberico*, 116 N.M. at 167, 861 P.2d at 202.  We must "evaluate [the] expert's personal knowledge and experience to determine whether the expert's conclusions on a given subject may be trusted." *Torrez*, 2009-NMSC-029, ¶ 21.

While we recognize that most courts have found quantifying the value of a human life, including the loss of enjoyment component, to be based on an unreliable methodology post-*Daubert*, we do not believe that the district court erred in finding Patterson's testimony reliable. *See, e.g.*, *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1245 (10th Cir. 2000) ("Troubled by the disparity of results reached in published value-of-life studies and skeptical of their underlying methodology, the federal courts which have considered expert testimony on hedonic damages in the wake of *Daubert* have unanimously held quantifications of such damages inadmissable."). Contrary to Defendant's characterization of Patterson's testimony, Patterson's testimony was mostly definitional in nature as to the types of considerations that can be taken into account when an economic value is placed on the enjoyment of a human life. He testified that economists have used several differing methods in valuing a human life, including the enjoyment component, and that application of these methods has led to a wide disparity in the dollar amounts that economists have provided as benchmarks. He then provided a very broad range of values for an individual Gurule's age, based on present value calculations of an annual range determined by a meta-study that averaged 67 individual studies to exemplify the wide divergence between economists in determining the value of the enjoyment of life. We cannot say that the district court abused its discretion in finding that this testimony had a reliable basis. *See Smith*, 214

21

F.3d at 1244-46 (applying New Mexico law and holding that expert testimony as to the "definition of loss of enjoyment of life" is reliable and based on a "noncontroversial conclusion" based on the assumption that "life is worth more than what one is compensated for one's work").

Defendant further argues that Patterson's testimony "could not assist the jury because the jury was charged with the task of determining the value of a particular life." In *Couch*, this Court addressed an identical argument. 2002-NMCA-084, ¶¶ 16-20. *Couch* involved the expert testimony of an economist, who testified that several academic studies "posited a range of values" for the economic value of a loss of an entire life. *Id.* ¶ 18. The expert refused to testify as to the specific value of the entire life that the plaintiff specifically lost as a result of his injuries, explaining that the jury would determine the percentage based on other evidence that was specific to the plaintiff, such as how the plaintiff "derived the most enjoyment from his life and how his injuries affected that enjoyment." *Id.* ¶¶ 18-19. This Court held that this type of testimony was helpful to the jury and therefore permissible, and further, if the expert "offered a specific value for [the p]laintiff's hedonic damages claim, he would have intruded improperly" on the jury's domain. *Id.* ¶ 20. Patterson's testimony similarly provided guidance and definitions on the meaning of hedonic damages and "gave the jury a range of monetary values that likely proved helpful in evaluating Plaintiff's

claim" based on the same type of studies. *Id.* ¶ 19. We therefore cannot say that the district court abused its discretion in determining that Patterson's testimony did not assist the jury through his specialized knowledge.

Defendant also argues that Patterson was not qualified as an expert because he lacked a "specialized education, training or experience in valuing the 'loss of enjoyment of life.'" However, as noted, Patterson testified only as to the theories and techniques economists use in determining the value of a human life, and his calculations were not based on his personal perceptions on the value of enjoyment of life, but instead were based on values derived from a benchmark meta-study. As to Patterson's qualifications, he has a bachelor's degree in economics, has taught a variety of economic topics, has authored materials on a variety of legal-economic topics, including the valuing of life, has been an expert in court over 120 times, including testimony regarding hedonic damages, and has been retained by Defendant in other cases. Additionally, Defendant cross-examined Patterson both on his qualifications and on his testimony. A general economic background in conjunction with experience as an expert are sufficient qualifications for expert testimony on the economic theories underlying the values provided by benchmarks studies on loss of enjoyment of life and calculating the present value of a range of benchmarks. *See Sena*, 119 N.M. at 478, 892 P.2d at 611 ("[I]t is not improper for the [district] court

23

to permit an economist to testify regarding his or her opinion concerning the economic value of a plaintiff's loss of enjoyment of life."). Based on the nature of Patterson's testimony and his background, we cannot say that the district court abused its discretion in finding that Patterson was qualified as an expert.

**PUNITIVE DAMAGES**

Plaintiff argues on cross-appeal that the district court erred in granting Defendant's motion for directed verdict on the issue of punitive damages because Defendant's actions show a reckless state of mind, warranting consideration of punitive damages. In granting Defendant's motion for a directed verdict on punitive damages, the district court found insufficient evidence of the required mental state.

We review a district court's ruling on a motion for directed verdict de novo. *Littell v. Allstate Ins. Co.*, 2008-NMCA-012, ¶ 59, 143 N.M. 506, 177 P.3d 1080. We resolve conflicts in favor of the party resisting the directed verdict. *Id.* "To be liable for punitive damages, a wrongdoer must have some culpable mental state, and the wrongdoer's conduct must rise to a willful, wanton, malicious, reckless, oppressive, or fraudulent level[.]" *Clay v. Ferrellgas, Inc.*, 118 N.M. 266, 269, 881 P.2d 11, 14 (1994) (citation omitted). Reckless is defined as "the intentional doing of an act with utter indifference to the consequences." *Couch*, 2002-NMCA-084, ¶ 58 (internal quotation marks and citation omitted).

24

Specifically, Plaintiff argues that there was sufficient evidence that (1) Defendant was aware of the dangers of rollover accidents, as evidenced by an acknowledgment that rollover fatalities increase due to intrusion of the roof structure, an acknowledgment in 1991 that 50 percent of light truck fatalities resulted from rollover impact versus 24 percent for passenger cars, and knowledge of legal claims alleging rollover deaths; (2) Defendant knew how to build safe roofs, citing Defendant's 1994 Mustang as an example; (3) Defendant could have manufactured a safe roof for the 1993 Ranger at a cost of $100 per vehicle according to Dr. Huerta; and (4) Defendant disregarded a 1967 cost-benefit analysis in which it concluded rollover protection could be justified if the cost per car was lower than $119. Plaintiff then asserts that a jury may draw reasonable inferences based on common knowledge and common sense between the knowledge of rollover dangers and the ability to build a safe roof, and thereby come to a conclusion that Defendant's failure to build a safer roof was in reckless disregard of the lives that would be lost.

In granting Defendant's directed verdict on the punitive damage issue, the district court found that Defendant did not ignore the knowledge of greater risk of fatalities in rollover accidents and that, indeed, Defendant attempted to strengthen the roof of the 1993 Ranger. Plaintiff's own expert, Dr. Huerta, testified that Ford added roof reinforcements to increase the strength of the Ranger roof between the 1992 and

1993 model years and that Ford undertook a program to increase roof strength in 1991 after several lawsuits were filed claiming excessive roof crush. This Court has previously held that undertaking safety measures and attempting to correct unsafe conditions is evidence that a defendant was not reckless in addressing the mental state for punitive damages, even if the jury found that the "[d]efendant should have done things differently" and found for the plaintiff in regard to liability. *Couch*, 2002-NMCA-084, ¶ 61. Further, Plaintiff's expert testified that the roof of the 1993 Ranger exceeded the federal roof strength standard by almost 50 percent. Plaintiff failed to introduce any counter evidence that the 1991 safety program or the roof reinforcement in 1992 was recklessly deficient and thus failed to show a "culpable mental state" required for punitive damages on the part of Defendant.

Further, to the extent that Plaintiff argues that the 1967 cost-benefit analysis and acknowledgment that a greater proportion of light truck fatalities are caused by rollovers compared to passenger cars, coupled with evidence that a stronger roof was feasible, provide sufficient evidence that a jury may draw reasonable inferences of a culpable mental state that Defendant's actions were reckless in designing the 1993 Ranger, we are unpersuaded. Plaintiff fails to show that Defendant ignored the information, either intentionally or recklessly, in designing the 1993 Ranger. It is not enough to simply show that Defendant was aware of the dangers caused by rollover

26

accidents and that it was feasible to design a reinforced roof. Instead, in order to survive a directed verdict, there must be a particularized showing that Defendant disregarded that knowledge in a reckless manner. *Cf. Couch*, 2002-NMCA-084, ¶ 60 (holding that "unsafe features in [the d]efendant's plant do not give rise to an inference [of] reckless[ness]" when the plaintiff did not provide any additional evidence "to show that the safety problems arose from or reflected a reckless indifference").

Further, Plaintiff's reliance on *Grimshaw v. Ford Motor Co.*, 174 Cal. Rptr. 348 (Ct. App. 1981) is unpersuasive. In *Grimshaw*, there was evidence that the defendant knew that the vehicle at issue had a fuel tank and rear structure that would expose consumers to serious injury or death in a 20 to 30 mile-per-hour collision and that the defendant could have corrected the design defect at a slight cost but decided to defer correction after a cost benefit analysis showed that it was more profitable to not correct the defect. *Id.* at 384. Particularly, the plaintiff presented detailed testimony and other evidence from several sources that the defendant's chain of command met and "defer[red] corrective action" even after being informed that the vehicle's "fuel tank . . . rupture[d] at low speed rear impacts" resulting in "significant risk of injury or death of the occupants by fire" after conducting a "cost-benefit analysis balancing human lives and limbs against corporate profits." *Id.* at 384-85. The evidence also

showed the defendant's "institutional mentality was shown to be one of callous indifference to public safety." *Id.* at 384. Plaintiff has failed to present any such evidence of a "callous indifference to public safety" or that a conscious or reckless decision was made to ignore design defects with regard to the roof of the 1993 Ranger. Indeed, the evidence shows that Defendant did take steps to increase the strength of the roof of the Ranger in 1991 and 1992 in order to allow the vehicle to better withstand rollover impacts.

While the jury ultimately decided that the roof of the 1993 had a design defect, the design defect was not the result of a culpable mental state, which is required for punitive damages. Therefore the district court did not err by granting Defendant's motion for directed verdict.

**CONCLUSION**

For the foregoing reasons, we affirm.

**IT IS SO ORDERED.**

_____
**JAMES J. WECHSLER, Judge**

**WE CONCUR:**

28

_____

**MICHAEL D. BUSTAMANTE, Judge**


_____

**CYNTHIA A. FRY, Judge**

29